# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DAVID HANDLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0672-SG |
| | ) | |
| CENTERVIEW PARTNERS | ) | |
| HOLDINGS L.P., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 7, 2023
Date Decided: April 24, 2024

C. Barr Flinn, Elisabeth S. Bradley, Kevin P. Rickert, Zeliang Liu, Hana Brajuskovic, and Elena C. Norman, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, *Attorneys for Plaintiff David Handler*.

Michael A. Barlow and Hayden Driscoll, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware, *Attorneys for Defendant Centerview Partners Holdings, L.P.*

**GLASSCOCK, Vice Chancellor**

The narrow, and rather unusual, subject of this Memorandum Opinion is whether Plaintiff, David Handler, was an employee of a Delaware L.P., or was in fact a partner in the entity that managed that L.P. The L.P. itself is an investment firm, a fact perhaps surprising in light of the informality with which the individuals involved here conducted themselves and their business, internally. The case arose as a request for books and records, standing for which was denied by the L.P. on the ground that Handler was not a partner.[1]

Handler was initially an employee of the L.P., and was given the title "Partner," as were other employees. This was an honorific; such partners were no more equity holders than Colonel Harland Sanders was a field officer, although they did in some cases have rights upon liquidation for deferred compensation. For several years thereafter, Handler discussed the terms of a partnership in "Topco," the entity managing the Partnership, with the firm's founders. The dispute here is whether Handler was offered and accepted a partnership in Topco, subject only to agreement on non-essential terms, or whether, as Defendant asserts, there was never a meeting of the minds with respect to a partnership in Topco. The matter comes down to one meeting of Handler with the founders, and whether a partnership

---

[1] A companion substantive case, dependent in part upon the outcome here, will address Handler's rights after leaving the company. *Centerview P'rs Hldgs. LP v. Handler*, C.A. No. 2022-0767-SG.

1

agreement was reached at that meeting. Handler alleges that an oral partnership in Topco was agreed to at that November 8, 2012 meeting.

The issue of Handler's status as a partner (and thus his standing to demand books and records) was tried. In this post-trial Memorandum Opinion, I find that Handler has failed to show, by a preponderance of the evidence, that the parties reached an agreement under which Handler (and his fellow employee, non-party David St. Jean) became partners in Topco. The parties' recollections of the crucial meeting are in conflict; the post-meeting correspondence between the founders and Handler and St. Jean, and between St. Jean and Handler themselves, supports a conclusion that no agreement was reached, and the abundant documentary evidence after the meeting is inconclusive. Handler has failed to demonstrate that he is a partner in Topco.

## I. FACTUAL BACKGROUND[2]

*A. The Parties*

Plaintiff David Handler ("Handler") joined a subsidiary of Centerview Partner Holdings L.P. (the "Company" or, with its subsidiaries, "Centerview") in 2008 as an employee with the title "Partner," with the goal to help grow the Company's

---

[2] Citations to the parties' joint trial exhibits are referred to by the numbers provided by the parties and cited as "JX __". *See* Updated Final Joint Trial Exhibit List, Dkt. No. 187. Citations to the parties' stipulated pre-trial order are cited as "PTO ¶ __". Pretrial Stipulation and [Proposed] Order, Dkt. No. 145. References to the trial transcripts are cited as "Tr. __:__". Tr. of 7-25-2023 Evidentiary Hr'g — Volume I, Dkt. No. 198; Tr. of 7-26- 2023 Evidentiary Hr'g — Volume II, Dkt. No. 199.

technology practice group.[3]  Handler joined the Company together with his friend, non-party David St. Jean.[4]  Handler resigned from the Company on August 1, 2022.[5]

Defendant Centerview is an independent investment banking and advisory firm.[6]  Centerview maintains offices in New York, London, San Francisco, Menlo Park, and Paris.[7]

Centerview has a multilayered entity structure, with Topco being the highest entity in Centerview's organizational structure.[8]  Topco is the sole manager of Centerview Partners Advisory Holdings LLC ("CPAH"), which in turn owns 99% of Centerview Partners LLC ("CP LLC"), Centerview's investment banking operating company.[9]

Topco was formed as a Delaware limited liability company on December 7, 2004 as "Pruzan Holding LLC."[10]  A later-filed Certificate of Amendment was filed with the Secretary of State of the State of Delaware on June 6, 2006, which changed Topco's name to "Centerview Partners Holding LLC," which subsequently converted into a Delaware limited partnership on November 19, 2013, with the

---

[3] PTO ¶ 18.
[4] *Id.*
[5] *Id.*
[6] *Id.* ¶ 19.
[7] *Id.*
[8] *Id.* ¶ 20.
[9] *Id.*
[10] *Id.* ¶ 21.

current name "Centerview Partners Holdings LP,"[11] to which I will refer, in its various incarnations, as "Topco."

Through CP LLC, Centerview's wholly owned broker-dealer subsidiary, Centerview conducts its U.S. advisory business.[12]

Non-parties Robert Pruzan and Blair Effron are two of Centerview's founders, and are limited partners in Topco (collectively, the "Founders").[13]



[11] *Id.*

[12] *Id.* ¶ 22.

[13] *Id.* ¶ 23.

## B. The 2008 Letter

On June 16, 2008, pursuant to an offer letter (the "2008 Letter"), Handler and two non-parties, David St. Jean and an undisclosed third party, joined Centerview as employees of CP LLC, with the title of "Partner," creating a "Tech Team" practice in the Company.[14] Although the 2008 Letter referenced Handler and St. Jean as "Partners," it did not reflect an actual partnership agreement at Centerview, but reflected an at-will employee status.[15] The 2008 Letter, however, guaranteed that Handler and St. Jean would earn 35% of revenues they generated up to $25 million, 40% of all revenues between $25 to $40 million, and 50% above the $40 million threshold.[16]

In addition, the 2008 Letter enabled Handler and St. Jean to participate in a fixed share of the Centerview Partners Profit Pool after 2010.[17] The 2008 Letter also gave Handler and St. Jean a collective 6.5% "Equity Interest," which constituted "an interest in the terminal value of Centerview upon a liquidity event (sale, IPO etc) . . ." ("TVIs").[18] The 2008 Letter explicitly stated that TVIs did not entitle Handler and St. Jean to a share of profits of the firm, ownership, or governance rights.[19] Further,

---

[14] JX2; PTO ¶ 18.

[15] JX2 at 2; Dep. of David Handler 35:20–36:3 ("First Handler Dep."). Centerview purportedly gives its senior employees the title "partner" in order to provide them with the freedom to build their own client relationships. Def.'s Post-Trial Opening Br. 2, Dkt. No. 201 ("DF PTOB").

[16] JX2 at 1.

[17] *Id.*

[18] *Id.*

[19] *Id.*

5

the 2008 Letter provided that if either Handler or St. Jean left Centerview before a liquidity event occurred, their "Equity Interest" was subject to repurchase at its tax value at the date of grant plus interest at 2.5%.[20]

*C. Partnership Proposals & Negotiations Prior to the Purported Oral Partnership Agreement*

After 2008, there were several failed attempts between the Founders and Handler to renegotiate the relationship created by 2008 Letter Agreement into a partnership agreement.[21] In 2011, St. Jean expressed a disdain for only receiving a "40% payout" from Centerview and failure to reach a partnership agreement.[22] In response, Effron expressed a commitment to working with St. Jean to achieve the latter result.[23] Soon after, Handler began to voice his concerns to the Founders about not being a Topco partner, threatened to leave the Company, and told a third party about his frustrations.[24] Eventually, on September 20, 2012, the Founders presented Handler and St. Jean a 60-page draft limited partnership agreement ("LPA") expressing the Founders' intent to add Handler and St. Jean as partners in Topco.[25]

---

[20] *Id.* The 2008 Letter defined "Equity Interest" as "an interest in the terminal value of Centerview upon a liquidity event . . . and will not entitle any of you to a share of profits of the firm or have any other incidents of ownership." *Id*.
[21] JX23; JX7; JX11; JX15-17; First Handler Dep. 50:3–53:4, 90:4–91:25, 105:6–11.
[22] JX12.
[23] *Id.*
[24] JX24; JX26; Tr. 14:22–16:2 (Handler).
[25] JX30.

6

Handler, for numerous reasons, rejected the proposed LPA without offering a counterproposal and continued to express his intent to leave the Company.[26] On October 24, 2012, in an email to Pruzan, Effron recounted an offsite meeting, stating that Handler and St. Jean wanted further negotiations to concern terms to "continue to be partners rather than trying to negotiate current agreement draft."[27] In other words, in an offsite meeting Handler and St. Jean conveyed to Effron that they were focused on changing their employment terms under the 2008 Letter, instead of negotiating the proposed Topco partnership agreement.[28]

Three days later, Handler and St. Jean sent the Founders an "addendum" to the 2008 Letter that served as their employment contract; the addendum addressed their annual compensation and suggested the establishment of a new technology focused private equity fund.[29] In response, the Founders began preparing a draft term sheet, which, contrary to the addendum, described a classic partnership with shared participation, risk, and reward.[30]

---

[26] Tr. 29:14–15, 30:15–31:1 (Handler). Handler rejected the LPA because it gave the Founders the right to effectively cancel the deal or change it in a material way, among other reasons. *Id.*
[27] JX35.
[28] *Id.*
[29] JX39 at 3; Tr. 215:6–11 (Handler). In regard to compensation, the addendum provided that the Tech Team would be paid 60% of revenue it generated, by Centerview Partners, LLC.
[30] JX43; JX44; JX47.

*D. The Purported Oral Agreement*

On November 8, 2012, Handler and St. Jean met with the Founders at the University Club in New York (the "November 8th Meeting"), where the Founders presented the proposed term sheet.[31] The term sheet included a compensation change for Handler and St. Jean and identified issues the parties would need to negotiate if they ultimately were to reach a written partnership agreement.[32] In particular, the proposed term sheet described traditional partnership concepts, such as sharing in profits and losses in the Company.[33] The proposed term sheet also detailed that Handler and St. Jean would receive a collective 14.5% equity grant in Topco, 12.5% immediately granted an additional vested 2% in June 2014, along with "Capital Priority Accounts."[34]

There is a discrepancy among the parties' recollection of the conversation that occurred at the University Club. Handler contends that the parties orally agreed to proceed with Handler and St. Jean *as partners in Topco* with some refinements and adjustment to the proposed term sheet's terms.[35] Handler sets forth the following terms of the purported oral partnership agreement:

a) Handler and St. Jean became senior partners at Topco;

---

[31] JX52; Tr. 36:4–40:1 (Handler).
[32] JX52.
[33] *Id.*; Tr. 41:3–22 (Handler).
[34] JX52 at 4.
[35] Tr. 55:22–56:3, 145:7–11, 149:1–7, 153:9–10 (Handler); Tr. 45:19–46:7 (Handler).

b) Handler and St. Jean's possible revenue share was to be 40% at $20 million of revenue and above;

c) Handler and St. Jean's share of the firm-wide profit pool would be no less than 20% for the first two years and then calculated based on the pro rata revenue contributions between the two new Topco partner groups;

d) Handler and St. Jean would cover some of the costs of junior professionals;

e) The Founders would receive an additional fixed 2% of profits for their firm management;

f) Handler and St. Jean would receive a share of the "Investment Capital" equal to their calculated profit share; it would constitute Priority Capital Amounts, and, if retained, it would be held in Topco's Priority Capital Accounts;

g) Handler and St. Jean were each granted 7.25% of equity in Topco (6.25% and another 1% to be granted later in 2014); and

h) Handler would have no restrictive covenants or forfeiture of economics upon departure.[36] That is, he was free to leave the Company at will, and take his equity with him.

Centerview asserts that the parties never came to a partnership agreement; the proposed term sheet was never signed, and the conversation left several important terms open for negotiation.[37] Centerview points out that the parties did not make any subsequent written reference to any oral partnership agreement, and it was not referenced in subsequent exchanges of draft LPAs.[38] It is Centerview's position that the parties agreed to a modification of the 2008 agreement which addressed Handler and St. Jean's compensation as employees, not as partners.[39]

---

[36] *See generally*, JX52; *see also* Tr. 51:10, 174:1–175:6 (Handler); *see also* Tr. 38:4–45:15, 54:15–55:1 (Handler); JX474 ¶ 18; JX413 at No.16.

[37] JX52; First Handler Dep. 123:1–6.

[38] Tr. 160:13–18 (Handler).

[39] *See* Tr. 361:5–19 (Pruzan); *see*, e.g., Tr. 139:19–142:15, 387:5–20, 388:1–4 (Centerview).

*E. Aftermath of the Purported Oral Agreement*

### 1. First Communications

The day after the purported oral agreement, Handler and Effron exchanged emails, with Effron expressing that he was looking forward to a "long and fruitful partnership[.]"[40]  Handler responded to Effron's email stating, "We need to absorb what you've put in front of us . . . We'll look to schedule some time to get together once we've had a chance to go through everything . . . ."[41]  A month later on December 16, 2012, St. Jean sent an email to Pruzan and copied Handler stating: "[w]hile we are both genuinely excited about getting to a final arrangement along the lines we have been discussing . . . we are not done working through the details of that agreement."[42]  The email further stated, "Clearly, when we are finally done . . . we will stand with you [] to invest capital . . . ."[43]

Afterwards, Handler sent the proposed term sheet to his attorney, stating, "to move forward on this we will need some senior level support from you."[44]  In addition, St. Jean and Handler exchanged drafts of the proposed term sheet with revisions.[45]  On December 14, 2012, St. Jean sent Handler an updated term sheet.[46]

---

[40] JX54.
[41] *Id.* at 2.
[42] JX138.
[43] *Id.*
[44] JX55.
[45] *Id.*
[46] JX62.

The revised draft included new governance rights and, under receipt of profit points, included the note "TBD Currently Under Discussion," with another note stating that the parties should "discuss this methodology and structure further."[47]

### 2. The Parties Exchange Numerous Draft LPAs

On January 8, 2013, Handler wrote the Founders via email stating he wanted to discuss with the Founders "a go forward agreement *in the similar spirit* that [the Founders] laid . . . out in November."[48] In that same email, Handler requested to speak with the Founders about the firm regarding a "general conversation about the firm, some constructive observations I have, recruiting (MS hires, London, etc)."[49]

Handler prepared an agenda for a January 25, 2013 meeting in which the Founders and Handler were to discuss a written partnership agreement.[50] The topics for the agenda included "[David Handler & David St. Jean] response to [the Founder's] Proposal" and "Open/New Issues for Discussion."[51] Handler also prepared a chart to facilitate this meeting.[52] The chart listed terms that were agreed upon between the parties, while also listing terms that were still under discussion.[53] For example, Handler listed "Legal Agreements Between [the Founders]" as

---

[47] *Id.* at 6.
[48] JX74 (emphasis added).
[49] JX74; *see also* JX79; Tr. 111:8–114:23 (Handler).
[50] JX79.
[51] *Id.*
[52] JX81.
[53] *Id.* at 4.

11

"Unclear" under the header "BE/RP Draft (November 2012)" and "DH/DSJ Response" as "For Discussion."[54]

For several more months, the parties carried on business as usual without executing a partnership agreement. For instance, the parties met again to discuss a partnership agreement in March 2013, but at the meeting's conclusion, the 2008 Letter, *i.e.* the employment agreement, remained operative, as evidenced in a memorandum detailing the meeting.[55] A month later, in an email to a third-party organization, where Handler chairs the board of directors, Handler expressed that he still had not signed partnership agreements with Centerview.[56] Again two months later, Handler, in an email to his accountant, expressed that the partnership agreement had not been executed.[57] In response to receiving a revised written partnership agreement from St. Jean, Handler responded: "I have to actually sign this thing?"[58]

Following the Founders proposing the concept of admitting Handler and St. Jean to the partnership, arising as of 2012, the parties never signed a written agreement. They continued to exchange drafts of the partnership agreement throughout the end of 2013.[59] On October 18, 2013, Handler sent a partnership

---

[54] *Id.*
[55] JX88 at 4.
[56] Tr. 94:4–10 (Handler); JX93.
[57] JX97.
[58] JX103.
[59] JX103; JX125.

agreement with revisions to the Founders and St. Jean.[60] The email, to which the agreement was attached, mentioned the November 8th Meeting, among others, and expressed an intention to "come together along the lines of those discussions."[61] The email stated further that "[a]s an alternative, we can just leave things as they are today. It's not the preferred outcome we'd like to see but it's perfectly fine. From a day-to-day perspective nothing will change."[62]

Ultimately, the Founders rejected Handler's proposed partnership agreement and themselves executed the limited partnership agreement (the "Topco LPA"), converting Centerview Partners Holdings LLC into Topco on November 19, 2013.[63] The Topco LPA did not include Handler and St. Jean as limited partners of Topco.[64] Nevertheless, the Founders continued to seek to add Handler and St. Jean to the Topco partnership by sending Handler a revised draft limited partnership agreement to sign on May 18, 2014.[65] Within the draft LPA's whereas clauses it noted that "an agreement of limited partnership was entered into" and that the limited partnership agreement was being sent to Handler because "the parties hereto desire to enter into this Agreement in connection with the admission of additional limited partners and

---

[60] JX125.
[61] Id.
[62] Id.
[63] JX126; JX135.
[64] JX126; JX135.
[65] JX169; JX170; JX171.

13

to amend and restate" the limited partnership agreement.[66]  In response, Handler stated he would "take a look and circle up with [Pruzan]."[67]

### 3. Handler's Compensation Increases and Varies

After the November 8th Meeting, Handler's compensation at the Company increased,[68] but his compensation continued to be recorded through W-2 forms.[69] From 2012 to 2018, Handler's compensation varied, as Handler's compensation remained subject to year-end negotiations with the Founders.[70]  The Founders had discretion to implement compensation principles flexibly, purportedly in a manner that benefited the firm and addressed issues for specific employees.[71]

For example, at a certain time, Handler's compensation did not coincide with the Tech Team's financial performance when it performed poorly.[72]  As a result, the Founders agreed to "gross[] up" Handler's profit points when the Tech Team failed to perform according to expectations in 2015,[73] causing Centerview to absorb the Tech Team's costs and losses.[74]  Handler also received Priority Capital Amounts as

---

[66] JX170 at 006.
[67] JX171.
[68] Tr. 361:5–19 (Pruzan); *see, e.g.*, Tr. 139:19–142:15, 387:5–20, 388:1–4 (Centerview).
[69] *See* JX163; Tr.154:13–155:11 (Handler).
[70] Tr. 348:2–4, 406:4–9 (Pruzan); JX300 (anticipating year end compensation discussion by detailing methodology for compensation).
[71] JX250 at 3.  One compensation principle included "revenue contribution to the . . . firm minus a charge for 'management fees' . . . adjusted for the profit points allocated to all other teams vs their annual contribution." *Id.* at 2.
[72] JX352 at Tab 2013 Cell E:20, Tab 2014 Cell E:21, Tab 2015 Cell E:21; JX 250 at 492; JX 260.
[73] JX250 at 492; JX260.
[74] JX250 at 492.

14

part of his compensation from 2012–2015.[75]  But, Handler did not receive Priority Capital Amounts after 2015.[76]

In the next year, Pruzan provided Handler with a compensation proposal that did not include priority amounts, but gave Handler a maximization of cash payouts.[77] In response, Handler submitted a compensation proposal, which set forth two principal terms for deliberation but did not demand a deferral of the Priority Capital Amounts.[78]  Eventually, in a 2018 compensation proposal to Handler, Pruzan informed Handler that Centerview would no longer give profit gross ups to the Tech Team.[79]  Handler's response to the proposal expressed an interest in participating in the "Investment Capital Account," acknowledged that he had not participated in it for three years, and did not express that his lack of participation violated an oral partnership agreement.[80]

### 4. Handler Elects to Receive TVIs in CPAH

During negotiations in 2013, Handler elected to receive TVIs in CPAH—the Topco subsidiary—via a 83(b) form pursuant to the 2008 Letter.[81]  The 83(b) form,

---

[75] JX319 at 2.

[76] JX249; *see, e.g.*, JX352 at 2016 Tab Cell E:35, 2017 Tab Cell E:35 (showing that Handler's compensation tracker did not reflect priority amounts after 2015).

[77] JX 250 at 493; Pruzan Dep. 179:2–19.

[78] JX262.

[79] JX301 at 490.

[80] JX318.

[81] JX23; First Handler Dep. 102:9–22; JX 129.  As mentioned previously, the TVIs in CP LLC did not reflect ownership interest in the firm, profits or losses, or governance rights.

to which Handler was a signatory, provided that "[u]pon termination of service, the Interest is subject to repurchase by the Company."[82] A memorandum attached to the 83(b) form also specified that "[Handler's] interests [were] subject to a substantial risk of forfeiture as a result of the Company's right to repurchase [Handler's] interests for the original fair market value as of the grant date, plus 2.5% per annum thereon, upon a termination of [Handler's] employment . . . ."[83] This language coincided with the specifications concerning the TVIs that was originally referenced in the 2008 Letter, under which Handler was an employee, not a partner.[84]

After his election, Handler began to receive Schedule K-1s, which recorded his TVIs in CPAH, but not in Topco.[85] To third parties, Handler represented and disclosed that his TVIs were in CPAH, by providing them with those Schedule K-1s.[86] In 2018, Handler sought information concerning his interests in Centerview.[87] Handler received a document that showed that his "Equity – Terminal Interests (B Units)" were held at "Centerview Partners Advisory Holdings LLC."[88] Handler did not express an opposition upon receipt of this information.[89]

---

[82] JX129 at 066.
[83] *Id.* at 067.
[84] *Id.*
[85] Tr. 155:12–20 (Handler).
[86] JX186 at 2 (Handler sent Schedule K-1 to accountant); JX345 at 2 (Handler sent CPAH 83(b) form to regulators); Tr. 153:10–154:2 (Handler) (admitting that he did not disclose he held Topco interests to gaming regulators).
[87] JX304.
[88] JX302 at 2.
[89] JX304; Tr. 152:3–10 (Handler).

16

### 5. Events Leading to the Books and Records Demand Letter

From the November 8ᵗʰ Meeting up until 2022, Handler did not express an intent to leave the Company.[90] In fact, Handler relocated his family to Silicon Valley to open a Centerview office, which prevented the firm from hiring a lateral partner to do so.[91] However, on January 2, 2022, Handler voiced concerns to the Founders about his compensation via email.[92] Handler asserted that his compensation was well below what he was owed pursuant to "any standard . . . and . . . the 2008 [employee] [L]etter agreement."[93] The email did not mention the purported oral partnership agreement in Topco.

Handler served a books and records demand on Topco, CPAH, and CP LLC on May 23, 2022.[94] Centerview refused Handler's request asserting that he was not a partner of Topco, and therefore was not entitled to books and records on May 31, 2022.[95] Thereafter, the parties engaged in numerous communications in disagreement from June 3, 2022, to July 15, 2022.[96] Handler resigned from the Company on August 1, 2022.[97]

---

[90] PL PT OB 29 (citing JX74); *see also* JX79; Tr. 111:8–114:23 (Handler).
[91] Tr. 77:18–79:18, 120:10–121:16 (Handler).
[92] JX377.
[93] *Id.* at 2.
[94] PTO ¶ 24.
[95] *Id.* ¶ 25.
[96] *Id.* ¶¶ 26–30.
[97] *Id.* ¶ 18.

*F. Procedural Background*

On August 1, 2022, Handler filed a complaint pursuant to 6 *Del. C.* § 17-305 to enforce the books and records demand served upon Topco on May 23, 2022, along with a motion to expedite (the "Books and Records Action").[98]  Defendant filed its answer on August 30, 2022.[99]  Defendant had previously filed a complaint in this Court in a separate action seeking a declaratory judgment that Handler was not a partner of Topco (the "Plenary Action").[100]  Handler filed his answer and counterclaims on October 4, 2022.[101]  Soon after, Topco filed a motion for judgment on the pleadings in the Books and Records Action.[102]  On November 3, 2022, I held a scheduling conference and stayed the Plenary Action and bifurcated the Books and Records Action to first determine the validity of Handler's assertion that he is a partner of Topco (the "Standing Issue").[103]

Topco filed a renewed motion for judgment on the pleadings on November 8, 2022.[104]  On January 9, 2023, Handler filed a motion to compel production of

---

[98] Verified Compl. Pursuant to 6 *Del. C.* Section 17-305 to Compel Inspection of Books and Records, Dkt. No. 1.

[99] Def.'s Answer to Verified Compl., Dkt. No. 9.

[100] *Centerview P'rs Hldgs. LP v. Handler,* C.A. No. 2022-0767-SG, Dkt. No. 1.  Handler filed his Answer and Counterclaims on October 5, 2022. Dkt. No. 18.

[101] *Centerview P'rs Hldgs. LP v. Handler,* C.A. No. 2022-0767-SG, Answer and Countercl., Dkt. No. 17.

[102] Def.s Mot. for J. on the Pleadings, Dkt. No. 12.

[103] Tel. Scheduling Conf., Dkt. No. 32.

[104] Def.'s Renewed Mot. for J. on the Pleadings, Dkt. No. 36.

documents and information from Defendant.[105]  Magistrate judge Bonnie W. David recommended that the motion be granted in part and denied in part in a Final Report and Recommendation on February 13, 2013.[106]  Handler filed a letter to Magistrate David to seek relief in connection with the February 13, 2023 Order,[107] which Topco opposed.[108]  Magistrate David held argument on the issues and delivered a Final Report and Recommendation in a bench ruling on February 28, 2023.[109]

On March 3, 2023, Topco filed a motion for a protective order[110] and notice of exceptions to the Magistrate's February 28, 2023 Final Report,[111] with Handler filing his oppositions on March 8, 2023.[112]  The Court heard oral argument on the motion and exceptions on March 9, 2023, and issued a bench ruling granting in part and denying in part the motion but adopting the Magistrate's Final Report with modification.[113]

---

[105] Pl.'s Mot. to Compel Prod. of Docs. and Info. from Def., Dkt. No. 61.

[106] Adopting Order, Dkt. No. 92.

[107] Letter to The Hon. Bonnie W. David from Elisabeth S. Bradley Regarding Order Granting Mot. to Compel, Dkt. No. 91.

[108] Letter to The Hon. Bonnie W. David from Michael A. Barlow on behalf of Def. Centerview P'rs Hldg. LP in response to Handler's Feb. 24, 2023 letter, Dkt. No. 93.

[109] Teleconference Status before Master Bonnie David on 2.28.2023 re: The Master delivered a final report under Rule 144 on discovery issues. Dkt. No. 94.

[110] Centerview P'rs Hldgs. LP's Mot. for a Protective Order, Dkt. No. 98.

[111] Centerview P'rs Hldgs. LP's Notice of Exceptions to the Master's Feb. 28, 2023 Final Report, Dkt. No. 99.

[112] Pl. David Handler's Opp'n to Centerview P'rs Hldgs. LP's Mot. for a Protective Order, Dkt. No. 107; Pl. David Handler's Opp'n to Centerview P'rs Hldgs. LP's Exception to the Master's Report, Dkt. No. 109.

[113] Hr'g on Exceptions to Master's Ruling and Mot. for Protective Order on 3.9.2023 before Vice Chancellor Laster- Mot. granted in part and denied in part, Dkt. No. 114.

Centerview filed a motion for continued confidential treatment on June 30, 2023,[114] which was opposed by Handler.[115] Thereafter, on July 12, 2023, Handler filed his motion for sanctions against Defendant,[116] with Defendant opposing the motion.[117] I held an evidentiary hearing in this action on July 25, 2023 and July 26, 2023.[118] I heard post-trial oral arguments on the Standing Issue, motion for sanctions, and motion for continued confidential treatment on November 7, 2023.[119] I took the matter under advisement that day.[120]

This Memorandum Opinion solely addresses the Standing Issue, and other non-related motions will be addressed in a separate letter opinion, to the extent necessary. To the extent that those motions seek sanctions in the form of certain inferences in favor of Handler, I have not identified a circumstance where such an inference, supported by equity, would change my decision here.

## II. ANALYSIS

Before me is the Standing Issue, which requires a determination of Handler's status within Centerview, as either a partner or employee. In dispute is a purported oral partnership agreement as alleged by Handler, that establishes his status as a

---

[114] Centerview P'rs Hldgs. LP's Mot. for Continued Confidential Treatment, Dkt No. 157.
[115] Pl.'s Opp'n to Def.'s Mot. for Continued Confidential Treatment, Dkt. 161.
[116] Pl.'s Mot. for Sanctions, Dkt. No. 164.
[117] Centerview P'rs Hldgs. LP's Opp'n to Handler's Mot. for Sanctions, Dkt. No. 184; Pl.'s Reply in Further Supp. of His Mot. for Sanctions, Dkt. No. 186.
[118] Trial before Vice Chancellor Sam Glasscock dated 7.25.23 through 7.26.23, Dkt. No. 189.
[119] Closing Arg. Post Trial before Vice Chancellor Sam Glasscock dated 11.7.23, Dkt. No. 219.
[120] *Id.*

partner in Topco. Plaintiff has the burden of proving each element of the oral partnership agreement by a preponderance of the evidence.[121] This standard of proof requires that the evidence shows that the fact at issue is more likely than not.[122] I find that Handler has not met this burden and that the record demonstrates that Handler was an employee when he left his employment with Centerview on August 1, 2022.

*A. Plaintiff Fails to Overcome his Burden to Establish there was an Oral Partnership Agreement Creating his Partnership in Topco*

Handler asserts that the November 8th Meeting resulted in an oral agreement to create a limited partnership in Topco.[123] Handler further asserts that the parties operated and performed in accordance with the purported oral partnership agreement.[124] Defendant, in turn, contends that the November 8th Meeting did not result in an oral partnership agreement.[125] Defendant also contends that Handler did

---

[121] *Grunstein v. Silva*, 2014 WL 4473651, at *16 (Del. Ch. Sept. 5, 2014), *aff'd*, 113 A.3d 1080 (Del. 2015), and *aff'd sub nom. Dwyer v. Silva*, 113 A.3d 1080 (Del. 2015). Although the issue here is simply whether Handler is a partner of Topco for purposes of the books-and-records statute, the matter is akin to a specific performance of the supposed oral partnership agreement, which would require clear and convincing evidence from Handler. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (holding that "[a] party must prove by clear and convincing evidence that he or she is entitled to specific performance . . . ."). The parties in briefing have asserted that the standard of evidence is preponderance, however, and for purposes of this Memorandum Opinion, I accept and apply that standard.

[122] *Id.*

[123] Pl. David Handler's Opening Post-Trial Br. on the Standing Issue OB 24–27, Dkt, No. 202 ("PL PT OB").

[124] *Id.* at 27–32.

[125] Def.'s Post-Trial Opening Br. 12–15, Dkt. No. 201 ("DF PT OB").

21

not assert that the oral partnership agreement existed until this present litigation ensued.[126]

Pursuant to traditional partnership principles, a partnership is created by "the association of [two] or more persons (i) to carry on as co-owners a business for profit form a partnership, whether or not the persons intend to form a partnership, and (ii) to carry on any purpose or activity not for profit, forms a partnership when the persons intend to form a partnership."[127] Under Delaware law, a limited partnership agreement "means any agreement, written, oral or implied, of the partners as to the affairs of a limited partnership and the conduct of its business"[128] and "shall be entered into or otherwise existing either before, after or at the time of the filing of a certificate of limited partnership[.]"[129] "The creation of a partnership is a question of intent."[130] A partnership exists if the parties had a "common obligation to share losses as well as profits."[131] Traditional contract principles apply to partnership agreements, as such a partnership agreement is only enforceable if it contains all material terms.[132]

---

[126] *Id.* at 33.
[127] 6 *Del. C.* § 15-202(a).
[128] 6 *Del. C.* § 17-101(14).
[129] *See* 6 *Del. C.* § 17-201(d).
[130] *Grunstein v. Silva*, 2011 WL 378782, at *9 (Del. Ch. Jan. 31, 2011) (quoting *Hynansky v. Vietri*, 2003 WL 21976031, at *5 (Del. Ch. Aug. 7, 2003)).
[131] *Id.* at 9 (quoting *Ramone v. Lang*, 2006 WL 905347, at *12 (Del. Ch. Apr. 3, 2006)).
[132] *Id.*

Under Delaware law, an enforceable contract exists when "(1) the parties have made a bargain with 'sufficiently definite' terms; and (2) the parties have manifested mutual assent to be bound by that bargain."[133]  Mutual assent "is to be determined objectively based upon the[ ] [parties'] expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent[.]"[134] Therefore, the Court must determine "whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that agreement concluded the negotiations . . . ."[135]  A contract is not required to be in writing in order to be enforceable: "Where the objective, contemporaneous evidence indicates that the parties have reached an agreement, they are bound by it, regardless of its form or the manner in which it was manifested."[136]

Here, the objective contemporaneous evidence demonstrates that Handler and Centerview did not reach an agreement on the essential terms to create a partnership in Topco at the November 8th Meeting.  It is clear that the Founders of Topco wished to bring in Handler and St. Jean as partners.  Prior to the November 8th Meeting,

[133] *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *21 (Del. Ch. Dec. 8, 2017) (quoting *Osborn ex rel. Osborn*, 991 A.2d at 1158).
[134] *Id.* (quoting *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986)).
[135] *Id.* (quoting *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986)).
[136] *Id.* (quoting *Debbs*, 1986 WL 1243, at *7).

Handler was considered an employee pursuant to the 2008 Letter. The Founders proposed terms for establishing a partnership with Handler before the November 8th Meeting, which were not acceptable to Handler.[137] Handler and St. Jean proposed an "addendum" to the 2008 Letter agreement instead.[138] At the November 8th Meeting, the parties came to an agreement about the terms of Handler's and St. Jean's continued employment at Centerview.[139]

Handler asserts that this meeting created a partnership in Topco.[140] The evidence offered into the record, however, belies this. To the extent the term sheet was an offer by the Founders to create a partnership with Handler, Handler did not accept. After the meeting, Handler sent the Founders an email stating, "We need to absorb what you've put in front of us . . . We'll look to schedule some time to get together once we've had a chance to go through everything . . . ." This, I find, is strong evidence that an agreement was not reached at the November 8th Meeting.[141] At trial, Handler characterized what took place at the November 8th Meeting as an "agree[ment] to agree" regarding partnership.[142]

Other email exchanges in the weeks after the November 8th Meeting, among the Founders, Handler, and St. Jean strongly indicate that neither Handler nor St.

---

[137] Tr. 29:14–15, 30:15–31:1 (Handler).
[138] Tr. 246:24–247:4, 253:10–19 (Handler).
[139] Tr. 361:5–19 (Pruzan).
[140] PL PT OB 24–27.
[141] JX54 at 2.
[142] Tr. 168:16–23, 246:21–4, 253:7–13 (Handler).

Jean considered that they had entered an oral partnership agreement. For example, on November 15, 2012, Handler sent the proposed term sheet to his attorney, stating, "to move forward on this we will need some senior level support from you."[143] In addition, on December 16, 2012, St. Jean wrote to Pruzan and with Handler copied stated: "[w]hile we are both genuinely excited about getting to a final arrangement along the lines we have been discussing . . . we are not done working through the details of that agreement."[144] Importantly, when Handler first expressed his displeasure with his pay in 2022, he sent an email to Pruzan and Effron stating his compensation was well below what he was owed pursuant to "any standard . . . and . . . the 2008 [employee] [L]etter agreement."[145] He did not reference the purported oral partnership agreement in Topco.[146]

Notably, several material terms were still up for discussion throughout the parties' years-long exchange of draft LPAs following the November 8th Meeting.[147] The parties also did not perform in accordance with the terms identified in the purported oral partnership agreement.[148] For example, Handler's compensation

---

[143] JX55.
[144] JX 138.
[145] JX377.
[146] *Id.* at 2.
[147] *See* JX62; JX79; JX125.
[148] *Compare* JX318 (stating that Handler had not participated in the Priority Capital Amounts for three years); JX250 (evidencing compensation were subject to the Founders' discretion and compensation proposals); JX129 (Handler's equity interests were recorded in CPAH), *with* JX52; Tr. 51:10, 174:1–175:6 (Handler); Tr. 38:4–45:15, 54:15–55:1 (Handler); JX474 ¶18; JX413 at No.16 (showing purported terms from the purported oral partnership agreement).

remained at the discretion of the Founders, and not the terms set forth in the purported oral partnership agreement.[149]  In fact, when his compensation did not coincide with the purported oral partnership agreement, Handler did not assert or express his rights under the purported oral partnership agreement.[150]  For instance, once Handler made an 83(b) election he began to receive Schedule K-1s, which reflected interests in CPAH, *not* Topco; he did not dispute the classification.[151]

In addition, during Handler's time at Centerview, before making his 83(b) election, Handler's compensation was reflected through W-2s, demonstrating that Handler was in fact an employee, and not a traditional partner.[152]  Notably, Handler never signed the LPA agreement, which, that document provides, is a requirement to form the partnership.[153]  In a similar vein, Handler represented to third parties that an agreement regarding the partnership had not been reached, evidencing that the parties were still in discussions regarding a partnership agreement and nothing

---

[149] JX250.

[150] For example, in a response to a compensation proposal, Handler expressed an interest in participating in the "Investment Capital Account," a term that Handler claims the parties agreed to in the purported oral partnership agreement, Handler acknowledged that he had not participated in it for three years and did not express that such violated an oral partnership agreement.  JX318.

[151] Handler argues that a lack of receiving Schedule K-1s is not indicative of a lack of an oral partnership agreement.  PL PT AB 48–51 (citing *Robinson v. Darbeau*, 2021 WL 776226, at *9 (Del. Ch. Mar. 1, 2021); *Cianci v. JEM Enter., Inc.*, 2000 WL 1234647, at *2 (Del. Ch. Aug. 22, 2000)).  I find that the record demonstrates that an oral partnership agreement was not reached between the parties; the lack of a Schedule K-1 is not determinative and is only a part of the evidence that I find predominates.

[152] *See* JX163; Tr. 154:13–155:11 (Handler).

[153] JX135 at 14 ("'Limited Partner' means each Person that is a signatory hereto and is listed on the signature pages hereto . . ."); JX103 (responding to St. Jean in an email "I have to actually sign this thing?").

26

pertaining to the agreement had been fully executed.[154]  Handler asserts that these communications merely evidence that either there was no written agreement to provide or that Topco had not been formed at that time.[155]  Handler's arguments are not persuasive.  I find that under a reasonable interpretation the third-party communications evidence that the partnership agreement was still under discussion, and not consummated.  These include Handler's email to a third-party organization, of which Handler chairs the board of directors, expressing that he still had not entered partnership agreements with Centerview,[156] and Handler's email to his accountant, stating that the partnership agreement had not been reached.[157]

Handler offers numerous arguments to support the creation and execution of the purported oral partnership agreement, none of which, in my view, are persuasive or sufficient to satisfy his burden.[158]  First, Handler points to Topco's ledgers to

---

[154] Tr. 94:4–10 (Handler); JX93 (expressing to a company, where he chaired the board of directors, that he still had not signed partnership agreements with Centerview); JX97 (emailing his accountant and expressing that the partnership agreement had not been executed).

[155] *Id.*

[156] Tr. 94:4–10 (Handler); JX93.

[157] JX97.

[158] Handler makes further arguments based on the Topco LPA, which is a written agreement that he did not enter.  According to Handler, Centerview's general counsel prepared schedules in 2014 that detailed that Handler, St. Jean, and two other Topco employees' 2013 Topco Class B Units were "issued in exchange for interests in CPAH."  PL PT OB 37.  This exchange, in Handler's opinion, supports his argument that he is a partner of Topco, because the LPA provided for this exact exchange and "Capital Contribution" but only "in connection with such person's admission to the Partnership:"

> "[w]ith respect to any Partner that contributed, exchanged or converted an interest in CPAH for an interest in the Partnership in connection with such Person's

demonstrate that the oral partnership agreement existed.[159]  Handler argues that Topco's 2012 Ledgers recorded Handler and St. Jean as holding 20% in Topco's operational proceeds, which in his view, was consistent with the terms that the parties agreed to at the November 8th Meeting.[160]  Similarly, Handler contends that the Topco 2012 Ledgers also recorded Handler and St. Jean holding "Priority Capital Amounts" in "Senior Preferred Accounts" and "Junior Preferred Accounts," accounts that were otherwise only held by Effron and Pruzan, the founding partners.[161]  The record evidences that "the spreadsheets are not, and were never, schedules to the LPA or ledgers of Topco partners."[162]  Rather, the spreadsheets that Handler reference track economic interests across the full Centerview organization,

---

admission to the Partnership, such Partner shall be deemed to have made Capital Contributions to the Partnership with respect to such contributed, exchanged, or converted interest as set forth in the books and records of the Partnership." *Id.*; JX135 § 1.5(a).

I find that the evidence does not support his assertion, as the record indicates that the other two individuals mentioned are themselves not partners, but employees, of Topco, who do not enjoy governance or control rights at Topco.  Tr. 368:11–15; 403:11–17 (Pruzan) (stating Hartman and Robinson are not partners and Centerview has discretion to set Hartman's and Robinson's compensation, similar to Handler's compensation structure).

[159] PL PT OB 9 (citing "Points" tab at JX072 (2012); JX161 (2013); JX217 (2014); JX232 (2015); JX271 (2016); JX307 (2017); JX329 (2018); JX343 (2019); JX393 (2020); JX421 (2022)).
[160] *Id.* at 34.
[161] *Id.* 35.
[162] Vicari Aff. ¶ 3.

and thus are unable to support Handler's argument that he is in fact a Topco partner.[163] They are evidence in support of a partnership, but not strong evidence.

Handler further contends that Topco ledger's "CPH LP Schedules" tab also recorded Handler holding Topco "Priority Capital Amounts" in Topco "Priority Capital Accounts" as well as Topco Class B Units.[164] I find that the "CPH LP Schedules" tab is a part of informal internal drafts, which do not reflect that Handler is a Topco partner. I find that the record evidences that Centerview's CFO/COO, Jeanne Vicari, prepared the "CPH LP Schedules" tab at Pruzan's request to facilitate the parties' partnership negotiations, to demonstrate what schedules to the LPA might have looked like if the parties had come to a partnership agreement.[165] But, because Handler and St. Jean never executed a written partnership agreement, that 2012 "CPH LP Schedules" tab was never finalized.[166] Pertaining to the 2013 "CPH LP Schedules" tab, I find that the record indicates that Handler and St. Jean had no interests as of 2013, since the spreadsheet contains dashes ("--") next to Handler and St. Jean's names under the "Class B Units" and "Interests in Operating Proceeds."[167]

---

[163] *See* Vicari Aff. ¶¶ 4, 9; Centerview Tr. 252:9–10 (Pruzan testifying that Vicari keeps these spreadsheets "as an aggregate consolidated look at the firm"); *id.* at 263:17–19 (Pruzan testifying: "It says 'Centerview Partners Holdings LP' at the top. This is a page that represents the consolidated Centerview Capital entity.").
[164] PL PT OB 39.
[165] Vicari Aff. ¶ 5; JX72.
[166] *Id.*
[167] JX161.

Handler also points to Topco's 2014–22 ledger records, which reflected that he held Topco "Priority Capital Amounts" in 2014. Handler further argues those ledgers also recorded that he received new Topco "Priority Capital Amounts" for three additional fiscal years after the November 8th Meeting, and continued to hold these interests in these Topco "Priority Capital Accounts," which accrued interest until he left in 2022.[168] Handler argues that these "Priority Capital Amounts" are quintessential partnership interests "tied directly to [Topco's] business fortunes," at risk with "no guaranteed right of payment," and for which the holder had "no financial rights other than a claim against the residual value" of the limited partnership.[169] According to Handler, receipt of Topco Priority Capital Amounts and Priority Capital Accounts directly contradicts Defendant's assertion that he was not a partner of Topco.[170]

The record contravenes Plaintiff's position concerning Priority Capital Amounts and TVIs. First, simply receiving economic interests does not provide that a partnership exists.[171] As I have previously found, Handler did not share in losses

---

[168] JX217; JX161 at "Sheet 1" Tab.

[169] Pl. David Handler's Answering Post-Trial Br. on the Standing Issue 16, Dkt. No. 211 (citing *Harbinger Capital P'rs Master Fund Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 230 (Del. Ch. June 29, 2006); *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *17 (Del. Ch. Feb. 28, 2020); 6 *Del. C.* § 17-101(15)).

[170] PL PT OB 42.

[171] *See Grunstein*, 2014 WL 4473641, at *23 (holding that a partnership did not exist where plaintiff did not have control and ownership in the purported partnership); *see also Silva*, 2011 WL 378782, at *9 (A partnership exists if parties have a common obligation to share losses as well as

with Centerview and did not have governance rights, indicating that a partnership did not exist. Second, as evidenced in the record, Handler's Priority Capital Amounts were a part of his annual compensation discussions, which were subject to the Founder's discretion, and not provided by the purported oral partnership agreement.[172]

Again, the documentary evidence pointed to by Handler is some evidence of an oral partnership, but not strong evidence. To the extent that this documentary evidence supports Handler's contention that an oral partnership agreement was reached at the November 8 Meeting,[173] I find that it is insufficient to rebut the record that supports a finding that the parties did not come to an agreement for all of the reasons previously listed.[174]

Handler, relying on *Grunstein*,[175] also argues that the exchange of various draft LPAs is not conclusive that the parties did not come to an oral partnership

---

profits.)*; see generally* 6 Del. C. § 15-202 (c)(3)(ii) (providing that an employee sharing profits does not create a presumption of partnership)).

[172] *See* JX250 at 3; JX249; JX352 at 2016 Tab Cell E:35, 2017 Tab Cell E:35 (showing that Handler's compensation tracker did not reflect priority capital amounts after 2015).

[173] Centerview asserts that these entries were placeholders, and, as I found above, this characterization is credible. Vicari Aff. ¶ 5; JX72.

[174] *See Pogue v. Hybrid Energy, Inc.*, 2016 WL 4154253, at *1 (Del. Ch. Aug. 5, 2016) (finding "that inclusion on the stock ledger states a prima facie, but rebuttable, case that a plaintiff is a statutory stockholder of record; and that, here, the undisputed record rebuts that presumption, precluding Pogue from the relief he seeks.").

[175] *Id.* at *10 (holding on summary judgment that "the fact that the parties exchanged draft agreements does not indicate as a matter of law that the parties never reached a different agreement.").

31

agreement at the November 8th Meeting.[176]  Handler is correct, but his reliance on

*Grunstein* is unpersuasive.  The exchange of draft LPAs is not conclusive but

supportive of my finding that the parties did not agree to the essential terms of an

oral partnership agreement, as evidenced by continued negotiations and unsuccessful

attempts to alter the original proposal over a period of time.[177]

In addition, Handler points out that he had expressed his displeasure at his

compensation and lack of ownership and argues that his remaining at Centerview

after voicing his discontent demonstrates that the parties must have reached an oral

partnership agreement at the November 8th Meeting.[178]  Before the November 8th

Meeting, however, Handler and St. Jean sent the Founders an addendum to the 2008

Letter, which addressed their compensation.  Afterwards, Handler's compensation

was consistent with the addendum to the 2008 Letter.  After the November 8th

Meeting, when Handler addressed his compensation issues with the Founders, he

asserted compensation rights provided by the *2008 Letter*, instead of the purported

oral partnership agreement.[179]  As such, I find that the record demonstrates that the

changes in Handler's compensation, post the November 8th Meeting, merely indicate

---

[176] PL PT OB 5; *Grunstein*, 2011 WL 378782, at *9.  Handler's reliance on other cases regarding mutual assent are also unpersuasive since they concern actions where an oral partnership agreement was not in dispute or involve evidence of executed written agreements.  *See* PL PT OB 4–6.

[177] *Grunstein*, 2014 WL 4473641, at *19.

[178] PL PT OB 18–20, 29–30.

[179] JX377 at 2 (asserting that his compensation was well below what he was owed pursuant to "any standard . . . and . . . the 2008 [employee] [L]etter agreement.").

Handler accomplished his purpose at the meeting, to increase his compensation at Centerview, which explains his continuing presence at the firm.

There is evidence in the record that supports the Plaintiff's contentions. Overall, however, I find that the evidence falls short of demonstrating an oral partnership agreement, and Plaintiff has not met his burden. Therefore, I conclude that when Handler left his employment in 2022, he was an employee with certain vested rights in Centerview (to be determined in the Plenary Action) but was not a Topco partner entitled to invoke 6 *Del. C.* § 17-305.

## III. CONCLUSION

For the foregoing reasons, I find that Plaintiff is not a partner of Topco and therefore not entitled to books and records under 6 *Del. C.* § 17-305. The parallel litigation, the Plenary Action, should proceed. To the extent motions in this books-and-records action need resolution, the parties should so inform me. The parties should submit a form of order consistent with this Memorandum Opinion.